*Court Of Appeals*
*Fourth Court of Appeals District of Texas*
*San Antonio*

★　★　★　　　　　　　　　　　　　　　　　★　★　★

# MEMORANDUM OPINION

No. 04-08-00646-CR

Flor E. **ARRIAGA,**
Appellant

v.

The **STATE** of Texas,
Appellee

From the 186th Judicial District Court, Bexar County, Texas
Trial Court No. 2006-CR-5701
Honorable Maria Teresa Herr, Judge Presiding

Opinion by:　　Karen Angelini, Justice

Sitting:　　　　Karen Angelini, Justice
　　　　　　　　Sandee Bryan Marion, Justice
　　　　　　　　Phylis J. Speedlin, Justice

Delivered and Filed:　July 15, 2009

AFFIRMED

　　　　Flor E. Arriaga was charged with one count of theft from an elderly individual, $500 - $1500, and three counts of debit card abuse. She was found guilty on all counts and was sentenced to two years confinement in state jail, probated, to run concurrently. Additionally, with respect to the theft count, she was fined $15,000. On appeal, Arriaga argues that (1) the evidence is legally and factually insufficient; (2) her right to confrontation was violated pursuant to *Crawford v. Washington*, 541 U.S. 36 (2004); and (3) the trial court erred in overruling her hearsay objection. We affirm.

## BACKGROUND

The allegations against Arriaga stem from her employment with the complainant, Mary Kelley. In 2005, Kelley was an eighty-year-old woman who, after a surgery in early 2005, needed the help of caregivers. Thus, she hired Domestic Agency to provide caregivers for her. Domestic Agency sent Arriaga to work for Kelley. In October 2005, Arriaga had been working for Kelley for a couple of months when Kelley accused Arriaga of stealing her money by fraudulently using her ATM debit card. Five months later, Kelley died. Arriaga did not stand trial until July 2008, at which time she admitted that she had used Kelley's ATM debit card, but testified that Kelley had given her consent to use the card. Thus, the factual issue to be determined by the jury at trial was whether Kelley had given Arriaga consent to use the ATM debit card.

## TRIAL

At trial, the State called six witnesses: Richard Dean Walsh, Cindy McQuarters, Benjamin Paul Watt, Patricia Sandusky, Officer Aaron Pembley, and Detective David Kinney. The defense called only one witness: Arriaga.

Richard Dean Walsh, Mary Kelley's son, testified that after his mother's open-heart surgery in January 2005, she was unable to take care of herself and needed a caregiver. The caregivers would make meals for his mother, help her with chores, drive her places, and assist her with purchases. Walsh further testified that his mother mostly paid bills by check and rarely used cash. According to Walsh, when his mother did withdraw cash, she did so from an ATM at a branch of her bank because she did not like to pay the fees associated with using another ATM. Kelley's bank records were admitted in evidence, and her bank statement for October 2005 showed four ATM withdrawals. On October 7, 2005, $200 was withdrawn from a convenience store ATM, which charged Kelley a

fee of $1.50. Her bank charged her an additional fee of one dollar. On October 11, 2005, $300 was withdrawn from a convenience store ATM, which charged Kelley a fee of $1.75. Her bank charged her an additional fee of one dollar. On October 12, 2005, $300 was again withdrawn from a convenience store ATM, which charged Kelley a fee of $1.50. Her bank charged her an additional fee of one dollar. Also on October 12, 2005, $150 was withdrawn from the ATM at Kelley's bank branch. Kelley's son, Walsh, was asked at trial whether Kelley would need $950 in cash over a period of a week to pay her bills. Walsh replied that she would not, explaining that his mother's car was paid for, her home was paid for, and that Kelley just had routine, normal bills that she, as a practice, paid by check.

Cindy McQuarters, a loss prevention manager for Valero Energy, then testified that in October 2005, she was asked by Detective Kinney about whether Valero Energy's convenience stores had retained videotape of October 7, 2005, and October 12, 2005. Because the videotapes repeat themselves every fifteen days, McQuarters was unable to retrieve videotape relating to October 7, 2005. However, she did retrieve videotape of October 12, 2005, at 8:17 a.m.[1] The videotape showed Arriaga entering the convenience store alone and withdrawing money from the ATM.

Benjamin Paul Watt, who in October 2005 worked in the Card Services Department of Kelley's bank, testified that on October 12, 2005, he received a call from Patricia Sandusky, another bank employee, informing him that one of the bank's customers, Kelley, was reporting fraudulent activity with respect to ATM transactions. Watt testified that Kelley opened her account on July 7, 2005, and that as a customer opening an account, she was offered a debit card. Watt further testified

---

[1] Using bank records, Detective Kinney was able to determine the exact date and time of the ATM withdrawal.

that Kelley had had no debit card transactions in July, August, or September. In October 2005, Kelley had four debit card transactions, one at the bank location, and three at an offsite ATM. And, he testified that Kelley had no debit card transactions in November. According to Kelley's bank records, the first time her debit card was used was on October 7, 2005, at a convenience store ATM.

Patricia Sandusky, a bank employee, next testified. She testified that on October 12, 2005, Kelley and her caregiver, a Hispanic woman who was about 5' 3", came into the bank branch. Kelley was upset and said that she had some transactions on her debit card that were not hers and that there was money missing from her account. Sandusky printed out the activity on Kelley's account. Kelley reviewed the transactions and identified three transactions that were not hers. When asked whether the debit card had ever been out of her possession, Kelley responded that it had not. When asked whether anyone else had control over her card, Kelley said that her caregiver knew the PIN number, because when they went to a drive-thru ATM, she would have to give her caregiver the card and tell her caregiver the PIN number to complete the transaction. According to Sandusky, Arriaga said that "it was not me [who] did those transactions."

Sandusky testified that she called Benjamin Watt of the bank's card services department, who printed out two forms for Sandusky: a Cardholder Dispute Form and a ATM/Freedom Card Fraud Research Form. Both forms were admitted in evidence. According to Sandusky, she helped Kelley fill out both forms. The Cardholder Dispute Form indicates that Kelley was disputing $807.75 in unauthorized charges on her debit card; that Kelley had the card in her possession; and that she discovered the loss and reported the loss on October 12, 2005. The ATM/Freedom Card Fraud Research Form states that she had authorized her caregiver, Arriaga, to use her card; that she knew

who may have used her card; and that her PIN was in her wallet with the card. The form then has a

place for "Member's Comments," which states the following:

> Card has been in possession. The first time Mary Kelley used the card was Tuesday[2] afternoon at the Live Oak Branch and withdrew $150. Mary Kelley and Flora [Arriaga] are the only ones to Mrs. Kelley's knowledge [who] knew the card number.

Sandusky testified that she handwrote the above for Kelley because Kelley had difficulty writing.

Kelley then signed both forms. Sandusky told Kelley that before the bank would reimburse her for

the fraudulent transactions, Kelley would have to file a police report.

On cross-examination, the defense questioned Sandusky about whether Kelley said she had

ever gone to an ATM to withdraw money with her caregiver:

> And it's on your – the other sheet. On reading it, the card has been in my possession. The first time that Ms. Kelley or Mary Kelley used the card was Tuesday afternoon. So as my memory is start – my memory is starting to come back. I think I asked her when she activated the card because in order to activate the card, you have to do a PIN-based transaction. And I think that she thought that – she was saying that she activated the card when she went to the Live Oak branch. But looking at the transactions, it was activated prior to that. When we see that type of situation, we will ask the member, "Is there anybody else [who] could have gotten your mail, [who] could have gotten the card, and could have gotten the PIN that was mailed to you and gone and used the card and the PIN since they have access to it? And that's where this could be from. The transactions prior to the 12th could have been – easily could have been – if anybody has possession of those two items, the transactions could have been done.

The defense then asked Sandusky how somebody activates a card:

> We will order the card. It takes seven to ten business days to receive the card. Separately a PIN, which is four numbers, is mailed to them. They can come a couple of days before or after the card. Once they have the card and the PIN, they go to an ATM, they put the card in there, they enter the PIN that was mailed to them, and they can do an inquiry or withdraw money. And now it's with that – that PIN-based transaction, that card has just been activated.

---

[2] Although Kelley's bank statement shows that this transaction happened on Wednesday, October 12th, Benjamin Watt testified that if a transaction occurs after 2:30 p.m., it will not post until the next day.

On re-direct, Sandusky testified that Kelley thought she had activated the card on Tuesday, October 11, 2005, because that was the first time she had used the card.

Officer Aaron Pembley then testified that on October 12, 2005, at 2:30 p.m., Kelley came into the police station with her caregiver, Arriaga, and wanted to file a report. After Kelley provided him with information, Officer Pembley contacted Benjamin Watt at the bank and obtained Kelley's financial records showing when and where the fraudulent transactions had taken place. Kelley told Officer Pembley that Arriaga had access to her card and PIN number, but was not allowed to make withdrawals without her permission. Kelley told Officer Pembley that Arriaga was not authorized to make the three transactions at issue.

Detective David Kinney then testified that he received the report filed by Kelley on October 14, 2005. He interviewed Kelley and obtained a written statement. Detective Kinney went to the three convenience stores in question and was able to retrieve video footage of the October 12, 2005, transaction, which showed Arriaga making a withdrawal at the convenience store ATM. At the end of direct examination, the following exchange took place between Detective Kinney and the State:

Q:    And did [Kelley] complete an intent to prosecute form?

A:    Yes, she did.

Q:    And who did she say she wished to file charges against?

A:    The defendant in this case.

Then, on cross-examination, the following exchanged occurred between Detective Kinney and the defense:

Q:    So in the second paragraph [of the report] when you said that Ms. Kelley acknowledged that Arriaga had access to her card and PIN number.

A:      Yes, sir.

Q:      Correct? And also said that she was not allowed to make a withdrawal without permission?

A:      Correct.

Q:      Doesn't that suggest that at some points she may have had permission?

A:      I'm not sure if she was allowed or not. She advised me that she was not authorized at the times of these three transactions.

Q:      Well, I'm just trying to make sure I understand what you meant when you wrote it that way. [It] seems to imply at certain times she had permission and certain times she did not.

A:      That's the gist of what I understood from our meeting, yes, sir.

Q:      In other words, that's what you intended when you wrote that?

A:      Yes, sir.

Q:      Okay. Did you see any need to inquire further of her when she told you that? For example: Ms. Kelley, tell me what you mean. When did she have permission and when did she not have permission?

A:      Well, like I said, sir, she brought these three separate incidents to my attention, stating that these were the three that were not authorized, so that's . . .

Q:      Okay. So you just took it that whatever transactions occurred in the past, these particular three in her recollection were not authorized?

A:      Correct.

The defense then moved to admit Defendant's Exhibit 1, which was admitted without objection. Defendant's Exhibit 1 is a copy of the affidavit Kelley signed at the police station and states the following:

> My name is Mary Kelley and I am 80 years old. Det. David Kinney assisted me with the preparation of this statement, [but] the words and thoughts are my own. On

10/12/05, at 1430, [my bank] called me and reported that over eight hundred dollars had been withdrawn from my account using my ATM/Debit card. The first withdrawal was on 10/06/05, at 1544 hours for $202.50, the second was [on] 10/10/05, at 1130, for $302.75, and the third was on 10/12/05, at 0820, for $302.50. I suspect one of my care takers named Flor Arriaga may have used the card to steal from me. She knew where the card was and she knew where the PIN number was because she occasionally did transactions on my behalf.

After the State rested, Arriaga testifed on her own behalf. According to Arriaga, she was present with Kelley when Kelley first activated her debit card. Arriaga was then asked to describe what happened when Kelley activated her card:

We went to the ATM, and we attempted to activate the card but three times it failed to do so. And, since the third time the card would no longer work because it just quit working, then I would help her get up in the car and took her to the office. I took her to the lobby of the bank, and I spoke to someone over there, one of the girls there. And [Kelley] told her what had been going on with her card. And, so I sat down, and she continued doing her things. And, that's when the girl told [Kelley] that she had to work the card three times in order to activate it. And, she did not remember the number three times. And, so that's when she asked me and that's when I helped her to do that.

Arriaga testified that Kelley asked her several times to take money out of the ATM for her, because Kelley could not walk well and was using a walking stick. Arriaga was not able to remember the exact dates that Kelley asked her to use the ATM card, but she did remember on one occasion, Kelley was at the animal hospital and needed money to pay the animal hospital. So, while Kelley remained at the hospital, Arriaga went to retrieve money from an ATM. Arriaga did not know why Kelley did not write a check. Arriaga was then shown pictures of herself using Kelley's ATM card at the convenience store. Arriaga admitted that the person in the picture was her. But, according to Arriaga, she had Kelley's permission to use the card, and the day in question was the day that Kelley asked her to withdraw money to pay the animal hospital. When asked why she had told the bank employee that she had not taken the money, Arriaga testified, "What I felt was that they asked the

question as if I had taken it out for myself and that's why I answered." Later, when asked again why she did not explain to the bank employee that Kelley occasionally gave her permission to use the card, Arriaga stated, "Well, the deal is when she told me this, I really felt bad so I kind of froze and I did not say anything." According to Arriaga, she then went to Mexico because her father had died, and when she came back, her boss informed her that there would be an investigation.

On cross-examination, Arriaga testified that she did not know when her father died, but said that it was sometime during the month of October 2005. Arriaga claimed that she stopped working for Kelley because she had to leave to go to Mexico because of her father's death. However, on cross-examination she was confronted with her paycheck stubs, which did not show a gap in payment until December 2005. According to Arriaga's paycheck stubs, she did not receive a paycheck between December 2, 2005, and March 3, 2006. When asked if that could have been when her father passed away, Arriaga could not recall, but claimed that there was not a lot of work during that time period. Arriaga was then questioned about the three transactions at issue:

Q: Did you make all three of those transactions that we're talking about on Mrs. Kelley's [debit] card?

A: Yes, ma'am.

Q: And you made the one that was at the drive-thru teller for the 150; is that correct?

A: Yes, ma'am.

Q: One was for 200?

A: Yes.

Q: Is that correct? One was for 300?

A: Yes, ma'am.

Q:     And the third one was for 300?

A:     Yes, ma'am.

Q:     Those were all three from convenience stores?

A:     Uh-huh, yes.

Q:     And then one was from the drive-thru at Randolph Brooks, at the bank, correct?

A:     Yes, ma'am.

Q:     What were the – what was the withdrawal for on October 6th?

A:     To tell you the truth, I don't know. She simply asked me to withdraw the money.

Q:     And what about October the 10th or the 11th – 10th, yes.

A:     The only thing I remember is the day that we were at the [animal] hospital and she needed the money, but I would not ask her otherwise because that was her business.

Q:     So when you were in the bank – Oh, tell me about activating the card again. How did you use the card on October 6th, the first time?

A:     She went to the ATM outside, she stuck the card in and she punched in the numbers, but it blocked – the numbers were blocked. So, she got back in the car and then that's when I took her around the bank to take her to the lobby.

Q:     What about the transactions on – the transaction on October 6th?

A:     She did it with my help.

Q:     At the convenience store?

A:     Yes, ma'am.

Q:     So now she got out and went inside a convenience store and tried to use it three times?

A:     No.

Q:    Then when did she try to use it three times? You said that – you just said that you used the card – on October 6th, you used it three times at convenience stores. And then – excuse me, go ahead.

A:    No. What happens is that I would only take her and then she would tell me to withdraw the money. And that's all I would do is simply help her out.

Q:    Okay. How long was her – which pet went to the animal hospital?

A:    Her cat.

Q:    And this is the same day that you went to the bank?

A:    Yes, in the morning.

Q:    So, her cat had a dire emergency that day. Your testimony is the cat had an emergency that day, had to go to the vet, she couldn't use her checkbook, and she sent you to an ATM to withdraw $300?

A:    No. The cat, by then, had already been at the hospital for about three or four days.

Q:    And, this wasn't mentioned by anybody at the bank, either by you or Mrs. Kelley, that that same day you had paid the money for the cat?

A:    No, ma'am.

Q:    And, you don't recall why you took out the money on the 6th for 200 and why you took out 300 on the 10th?

A:    She would tell me to withdraw this money and that's what I would do. I really can't tell you what she would want it for. I would simply do what she asked me to do.

Q:    And on the 6th, which was the first time that the ATM card was used, that's not the day that you had difficulty with the PIN number?

A:    I don't remember.

Q:    You heard the bank person testify that the first time you used the card, you just used the card and the PIN and you activated it, correct?

A:    Yes, I heard that.

Q:      *And you were the first one to use the card, correct?*

A:      To tell you the truth, yeah.

Q:      And you activated the card on that first day you used it?

A:      With her.

Q:      With her. At the convenience store?

A:      Yes, ma'am.

Q:      So on that day she took her walker and walked into the convenience store?

A:      Yes.

Q:      Okay. When you withdrew the $150, that was actually on Tuesday afternoon, correct?

A:      Yes. If that's what it says, that's what it is.

Q:      And then Wednesday morning is when you took the money out, the $300 that we saw on the videotape?

A:      Yes.

Arriaga then testified that she did not tell the bank employee that Kelley had given her permission to make the withdrawals, nor did she inform the police officer at the police station that she had permission.

**LEGAL AND FACTUAL SUFFICIENCY**

Arriaga argues that the evidence is legally and factually insufficient to support the jury's findings that she committed the offenses of theft from an elderly individual and debit card abuse, because no rational juror could have found that Arriaga acted without Kelley's consent.

In a legal sufficiency review, we view the evidence in the light most favorable to the verdict and then determine whether a rational trier of fact could have found the essential elements of the

offense beyond a reasonable doubt. *Prible v. State*, 175 S.W.3d 724, 729-30 (Tex. Crim. App. 2005). In a factual sufficiency review, we view all the evidence in a neutral light and will set the verdict aside only if the evidence is so weak that the verdict is clearly wrong and manifestly unjust, or the contrary evidence is so strong that the standard of proof beyond a reasonable doubt could not have been met. *Id.* at 730-31. Further, in assessing the sufficiency of the evidence to support a conviction, we must consider *all* the evidence that the jury was permitted, whether rightly or not, to consider. *Moff v. State*, 131 S.W.3d 485, 488 (Tex. Crim. App. 2004); *Thomas v. State*, 753 S.W.2d 688, 695 (Tex. Crim. App. 1988).

On appeal, Arriaga argues that the evidence is legally insufficient to establish that she acted without Kelley's consent. Arriaga emphasizes that although "obviously unavailable to testify" due to her death, Kelley was able to "speak to the jury through her police statement to Detective Kinney, which was introduced into evidence by the defense, without objection." Arriaga emphasizes the last sentence in Kelley's affidavit: "Flor [Arriaga] knew where the card was and she knew where the PIN number was because she occasionally did transactions on my behalf." Arriaga emphasizes the word "occasionally," arguing that Kelley admitted she had given Arriaga permission to use the card more than once. However, in making this argument, Arriaga ignores the rest of Kelley's statement where she specifically states that the following three transactions were made without her consent: 10/6/05 for $202.50; 10/10/05 for $302.75; and 10/12/05 for $302.50. Further, Kelley's statement specifically accuses Arriaga: "I suspect one of my care takers named Flor Arriaga may have used the card to steal from me." Thus, the evidence is legally sufficient to support the finding that Arriaga did not have Kelley's permission in making the three transactions described above.

With regard to factual sufficiency, Arriaga argues that the "great weight and preponderance of the evidence proves that Arriaga did have Mary Kelley's consent to use her ATM/debit card on all four occasions where it was used," again emphasizing Kelley's use of the word "occasionally" in her statement to police. However, in doing so, Arriaga ignores much of the evidence presented at trial.

At trial, evidence was introduced, including bank statements, showing that Kelley mostly used checks to pay bills and rarely used cash. When Kelley did withdraw cash, she liked to use her bank branch so that she would not be charged additional fees. Patricia Sandusky, the bank employee, and Detective Kinney both testified that Kelley told them that the three transactions from convenience store ATMs were fraudulent and that she believed Arriaga was responsible. Sandusky also testified that when members request debit cards, the PIN number and card is mailed to them separately. According to Sandusky, Kelley said that she thought she had first activated her card on October 11, 2005, when she withdrew money from the local bank branch. However, Sandusky noted that two transactions in dispute had occurred before that date. When asked about this discrepancy, Arriaga at first claimed that she had helped Kelley activate the card at the local branch ATM and went with her inside to the bank lobby when the card would not activate. However, when it was pointed out that the first transaction actually occurred at a convenience store ATM, Arriaga changed her story: She claimed that she took Kelley to the convenience store ATM and that Kelley accompanied her inside with a walker to activate her card. Reviewing all the evidence, we hold that the evidence is factually sufficient.

## CRAWFORD V. WASHINGTON

In her third and fourth issues, Arriaga claims that her right to confrontation was denied by the admission of Kelley's bank records and by Sandusky's testimony about her conversation with Kelley.[3] Pursuant to *Crawford v. Washington*, 541 U.S. 36, 59 (2004), the admission of testimonial hearsay violates the Confrontation Clause unless the declarant is shown to be unavailable to testify and the defendant had a prior opportunity to cross-examine the declarant. Although we defer to a trial court's determination of historical facts and credibility, we review whether a statement is testimonial de novo. *Wall v. State*, 184 S.W.3d 730, 742 (Tex. Crim. App. 2006).

Although the Court in *Crawford* left "for another day any effort to spell out a comprehensive definition of 'testimonial,'" it stated that "[w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Crawford*, 541 U.S. at 68. We first note that although Arriaga complains generally of the admission of Kelley's "bank records," State's Exhibit 1 merely consists of Kelley's bank statements and canceled checks, which reveals the normal recorded activity on Kelley's account with the bank. Nothing in State's Exhibit 1 is testimonial. State's Exhibit 2 consists of Kelley's membership application to open the account and more bank statements relating to Kelley's account. Nothing in State's Exhibit 2 is testimonial.

Indeed, the only records that could arguably be considered testimonial were admitted as State's Exhibit 3. State's Exhibit 3 consists of a "Cardholder Dispute Form," a "ATM/Freedom Card Fraud Research Form," and a print-out of transactions on Kelley's account. In the Cardholder Dispute Form, Kelley indicated that the debit card was always in her possession, that she discovered

---

[3] We note that Arriaga has not complained in her brief about comments made by Kelley to Officer Pembley or Detective Kinney. *See* TEX. R. APP. P. 38.1(i).

the loss on 10/12/05, and that there were unauthorized transactions in the amount of $807.75. In the ATM/Freedom Card Fraud Research Form, Kelley listed the three unauthorized transactions, stated that she had authorized Arriaga to use her card in the past, that she knew who may have used her card, and that she believed that person to be Arriaga. Next to the part of the form that asks whether the PIN was with the card, there is the following handwritten note, which Sandusky testified that she wrote for Kelley: "Mrs. Kelley stated that the PIN was in her wallet with the card on a piece of paper." And, at the end of the form under "Member's Comments," there is the following handwritten note: "Card has been in possession. The first time Mary Kelley used the card was Tuesday afternoon at the Live Oak Branch and withdrew $150. Mary Kelley and Flora [Arriaga] are the only ones to Mrs. Kelley's knowledge [who] know the card number." The print-outs include transactions that have been highlighted. Sandusky testified that after Kelley identified a transaction that she had not authorized, Sandusky would highlight that transaction on the print-out.

Arriaga also complains of statements made by Kelley to Sandusky.

The State responds that the comments contained within State's Exhibit 3 and the statements made to Sandusky by Kelley are not testimonial because they were made to a non-government employee. Neither the United States Supreme Court nor the Texas Court of Criminal Appeals has extended *Crawford* to include statements made to non-government employees. *See De La Paz v. State*, 273 S.W.3d 671, 680 (Tex. Crim. App. 2008) (noting that the Supreme Court has not resolved the issue of whether a statement made to a non-government employee can be testimonial and declining to address the issue, instead holding that the State had not met its burden under *Crawford*). We need not address the issue here, however, because even if the comments contained within State's

Exhibit 3 and the comments made by Kelley to Sandusky were testimonial, any error in their admission was harmless.

We must reverse a conviction for a violation of a defendant's right of confrontation unless we determine beyond a reasonable doubt that the error did not contribute to it. *See* TEX. R. APP. P. 44.2(a); *see also Delaware v. Van Arsdall*, 475 U.S. 673, 681-84 (1986) (violation of defendant's right of confrontation subject to harmless-error analysis). In considering whether such error was harmful, we may consider several factors: (1) how important the statement was to the State's case; (2) whether the statement was cumulative of other evidence; (3) the presence or absence of evidence corroborating or contradicting the statement on material points; and (4) the overall strength of the State's case. *Scott v. State*, 227 S.W.3d 670, 690 (Tex. Crim. App. 2007). We may also consider the source and nature of the error, the amount of emphasis by the State on the statement; and the weight that a juror would probably give it. *Id.* With these considerations in mind, we must ask ourselves whether there is a reasonable possibility that the *Crawford* error, if any, moved the jury from a state of non-persuasion to one of persuasion on a particular issue. *Id.*

The statements made by Kelley to Sandusky and those statements made in State's Exhibit 3 were important to the State's case; however, they were also cumulative of other evidence. Officer Pembley testified that Kelley told him Arriaga was not authorized to use the debit card with respect to the three transactions at issue. Detective Kinney testified that Kelley completed an intent to prosecute form with respect to the three transactions at issue and said that she wished to file charges against Arriaga. Further, there was other evidence corroborating the statements. The bank statements showed that Kelley rarely withdrew cash from her account and used checks for most of her transactions. They also showed that she had never needed over $950 in cash over a period of a week

in the previous months or the subsequent one. Her son testified that she did not have a mortgage or a car payment, and only had routine bills. Further, he testified that because she did not like to pay additional fees, as a practice, she used the ATM at the bank branch. The three transactions at issue were not at Kelley's local branch, but were completed at convenience store ATMs. And, on October 12, 2005, Arriaga never stated to either Sandusky or Officer Pembley that she made the transactions or that she had Kelley's consent. And, Sandusky testified that Arriaga claimed affirmatively not to have made the transactions. Indeed, the State's case against Arriaga was quite strong. Most of the evidence contradicted Arriaga's version of events. Arriaga claimed that she had helped Kelley activate the debit card and when there was trouble with the card, they went inside the bank branch. But, when reminded that the first transaction occurred at a convenience store ATM, she claimed that Kelley had accompanied her to the convenience store. She had no credible explanation for why she told Sandusky that she had not made the three transactions on Kelley's behalf or why she remained silent at the police station. Finally, we note that the State did not place a lot of emphasis on Kelley's statements during closing argument but instead focused on Arriaga remaining silent at the bank and police station and the reasonableness of Arriaga's version of events. We, therefore, hold that any error in admitting State's Exhibit 3 and Sandusky's testimony relating to Kelley's statements was harmless.

## HEARSAY

Arriaga argues in her fifth issue that Sandusky's testimony of Kelley's statements were inadmissible hearsay. The State responds that the statements were admissible as an excited utterance. We review a trial court's ruling on the admissibility of evidence under an abuse of discretion standard. *Montgomery v. State*, 810 S.W.2d 372, 378 (Tex. Crim. App. 1990).

Texas Rule of Evidence 803(2) states that a hearsay statement is not excluded by the hearsay rule if it is a statement "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Tex. R. Evid. 803(2). The evidence here showed that as a result of a call from her bank, Kelley learned that her account was missing $800. Sandusky testified that Kelley was very upset when she arrived at the bank, claiming that money was missing from her account. When Sandusky and Kelley identified the three transactions made without her consent, Sandusky asked Kelley if she had the card in her possession at all times. Kelley said that she did. Sandusky then asked her if anyone could have taken the card without her knowledge. Sandusky testified that Kelley did not want to believe that her caretaker could do such a thing. Thus, the evidence shows a frail, eighty-year-old woman, who was recovering from heart surgery and needed help at all times, learning that someone had taken money out of her account and then on arriving at the bank, learning that her caretaker could be the responsible party. Under the facts of this case, we cannot find that the trial court abused its discretion in admitting Sandusky's testimony. Moreover, even if the trial court erred in overruling Arriaga's hearsay objection to Sandusky testifying about Kelley's statements, any such error would be harmless for the same reasons as explained above. *See* Tex. R. App. P. 44.2(b) ("Any other error, defect, irregularity, or variance that does not affect substantial rights must be disregarded.").

## Conclusion

We affirm the judgment of the trial court.

Karen Angelini, Justice

DO NOT PUBLISH